Good morning, Your Honor. Lawrence Rolfing on behalf of Mai Chang. This is a social security disability case. It has to do with a single issue of the ALJ's treatment of the examining psychologist's opinions about Ms. Chang's ability to function. The Dr. Hirakawa clearly diagnosed Mai Chang as suffering from a major depressive disorder and gave her a global lesson. I was kind of confused about something with Dr. Hirakawa. His first line is, this is a comprehensive psychiatric evaluation. And his letterhead, it says MDSI Physician Services. But then I look at the signature line of the letter, and he's not a psychiatrist. He says Ph.D., doesn't say what it's in, and then psychiatry. But they don't give Ph.D.s in psychiatry, I don't think. They're in psychology. What kind of doctor is he? Dr. Hirakawa is a psychologist. He regularly performs examinations for the California State Agency. He works through MDSI. So he's an agency psychologist. Usually psychologists are the most expert for certain things. For example, if they give an IQ test. Right. They're the expert on that. Psychiatrists don't give IQ tests. But if you're trying to diagnose somebody to decide whether they have depression, or bipolar disease, or situational depression, or bipolar depression, or whatever kind of psychiatric problem they have, psychologists aren't competent to do that. They don't do that. Psychiatrists do. The agency can't. I don't think a psychologist has prescription authority for SSRIs and other psychiatric drugs, does he? Not in the State of California. And this is a California case. So he would not have prescription authority for the conditions that he purports to diagnose. That's correct. But that doesn't mean that psychologists don't treat depression. They would treat with talk therapy. If pharmacological intervention is necessary, they would treat in conjunction with a psychiatrist. The usual thing is both, actually. Psychiatrist sees the patient, diagnoses, prescribes SSRIs and talk therapy, and a psychologist or licensed social worker or other non-MD person often does the talk therapy. Right. The statute at 42 U.S.C. 416-H talks about the evaluation of mental impairments as part of the 1984 Disability Reform Act. And the statute treats psychologists and psychiatrists with the same broad brush and prescribes the use of the psychiatric review technique form and the mental residual functional capacity form and says that either a psychiatrist or a psychologist has to fill them out. Doesn't the statute make the distinction that you're making, Your Honor? This is the State statute. This is the Federal statute. Federal. Social Security Act. Yes. It describes the process by which mental impairments are evaluated. So whether he's a psychiatrist or not, the Feds accept psychologists as psychiatrists for this purpose. For all purposes, yes. The statute makes no distinction. Neither do the regulations make a distinction between psychiatrists and psychologists in terms of... All right. So this was not a treating person. It was somebody appointed by the agency to examine her, and he met with her and he examined her. That's correct. There were other reports otherwise. She treated at the King's Winery Clinic. There are some sparse treatment notes indicating that she had some depression. The clinic where she was treated prescribed her with bilbutrin, Paxil, Trazodone, and other medications. So she was treated with an array of psychotropic medications. We know from both Dr. Hirakawa and Dr. Kasner, which is in the next report in the file, that she was, in fact, treated with psychotropic medications. And then so the only physician to give an opinion about her ability to function that has either examined or treated Ms. Chang is Dr. Hirakawa. Except he's not a physician. Well, the regulations... He's a psychologist. He's a psychologist, and the regulations treat him as an accepted medical source. Well, but Dr. Chang said the number of hours that claimant could be expected to stand and walk, cumulative in an 8-hour workday, is about 6 hours, limited by fatigue and depression. Right. So that is an opinion. Yes, and it's an opinion that her mental impairments are affecting her physical function, and whether or not she can perform the mental requirements of work requires a psychologist or psychiatrist to define that for us. And Dr. Hirakawa is the examining physician. The regulations are very clear that the commissioner always prefers the opinion of an examining source over the opinion of a non-examining source. And that's congruent with Ninth Circuit case law. Lester is the case that's typically cited for that proposition. And so Dr. Hirakawa gives us the opinion that Mrs. Chang has a poor capacity for detailed work, completing a normal workday, dealing with changes in a work setting, and sustaining attention and concentration, and that she has a high likelihood of deteriorating in a normal work setting. The ALJ rejected some of those, but not all of those. And Dr. Hirakawa also opined that Mrs. Chang has a fair capacity for very short and simple instructions and a fair capacity to work without special supervision. It sounds as though from that as though she could still do the kind of work she used to do in Thailand, which is being a farmer. He doesn't say that, that she can go back to subsistence farming in the Hmong community in Laos. I think they have a lot of farming in California. They have a lot of farming in California, but farming in California and farming in the Commission doesn't care whether it's in her homeland or here, but farming in California is not done the same way as it is in Southeast Asia. It's a completely different process. The American economy was founded on a scarcity of labor and an abundance of capital, and that's the opposite of the paradigm in Southeast Asia. And so there's no evidence to suggest that she ever engaged in substantial labor activity. Kagan. So what this case comes down to, as I understand it, is the following. Dr. Hirakawa said what he said, and the ALJ said that he was going to give very little weight to Dr. Hirakawa's opinion at the claimant would have poor ability to complete a normal workday work where he can deal with changes in a work setting. As it appeared, he based his conclusion on the claimant's poor motivation and cultural differences. And the question is, was he entitled to do that? Is that the case? That's the substance of the case. That's it. So why was he entitled to do that? Because the regulations require an ALJ in assessing mental impairments to consider cultural background as part of the disability calculus, and the existence of lack of motivation and lack of energy aren't the same thing. No, they're not. But they're both indicators separately of a depressive disorder that would be evaluated under Listing 12.4. I'm not sure whether he says the motivation problem is caused by a medical condition. I mean, many people are unmotivated, like a lot of young people that don't get jobs, and it's not caused by a medical condition. The cultural conditions, I gather that's a fancy way of saying she doesn't speak English. So if she's unmotivated and doesn't speak English, and that's what keeps her from working, it's not a disability. If she's unmotivated because of a psychiatric condition, and that causes her lack of ability to, say, be a field hand in California where a lot of people don't speak English. Then that may be a disability, and I'm having trouble figuring out which it is. Well, Dr. Herrick, how is it the opinion that it's her depressive disorder that's the causation? Find me the line that says so. On page 143 of the administrative record. Got it. The first paragraph talks about her capacity. It says claimant's ability to understand and remember very short and simple instructions is fair. The claimant's ability to understand and remember detailed instructions is poor. The claimant's ability to maintain attention and concentration is poor based upon her depression. Well, it says based upon her depressive symptoms, fatigue, and poor motivation, actually. Are we at the same sentence there? I have four lines. Here's the next paragraph down. I was one paragraph up. The last sentence of the preceding paragraph is that the claimant's ability to maintain attention and concentration is poor based upon her depression. The paragraph that you're referencing, Your Honor, is to complete a normal work week without interruptions at a consistent pace is poor based upon her depressive symptoms, fatigue, and poor motivation. But poor motivation is one of those things that it just, it's, here's my problem. It looks like it could go either way. I look at her list of medications, kind of a long list, and probably some of them cause her to be pretty dopey during the day. And as I understand it, if it can go either way, the commissioner wins. Only if the judge explains why it goes his way or against the claimant. And the judge didn't explain why. He addressed some of the limitations addressed by Dr. Harakawa, but not all of them. And I don't think the Court should rewrite the ALJ's decision to say, well, these stated reasons apply to reasons that the judge didn't apply them to. And the reasons that the judge articulated, talking about cultural and motivational factors, Dr. Harakawa doesn't say that her ability to maintain attention and concentration is poor based on cultural or motivational factors. That would be completely rewriting Dr. Harakawa's report, and the ALJ is not allowed to do that either. Okay. Your time is up. Thank you very much. Good morning, Your Honors. I'm Elizabeth Feer, and I represent the Commissioner of Social Security in this case. And you're absolutely correct, Your Honor, this case does come down to whether or not the ALJ properly rejected certain elements of Dr. Harakawa's opinion. And the credibility determination isn't a given because it wasn't contested. Correct. And I think that's the missing link here, is Dr. Harakawa made certain findings. The ALJ accepted them to the extent they were consistent with his finding of simple, repetitive work, but he rejected the findings that were poor. And my opponent's correct. He didn't address every specific one, but the ones he addressed encompassed them all. Dr. Harakawa said this claim would have a poor ability to complete a normal work day or work week without interruption from psychological factors and to deal with changes in a work setting. The ALJ specifically rejected those findings of Dr. Harakawa, and he said it's because the doctor apparently based his opinions on cultural differences and a lack of motivation. And how does he – where did he get that from? Well, I think – and this is where you tie in the credibility. This claimant has made rather bizarre allegations of what she's unable to do. Well, I understand that, but he's attributing – he's sort of reading into Dr. Harakawa's determinations that they were based on poor motivation and cultural differences, and I'm wondering where he's getting that from. That's – this is not about her. It's about Dr. Harakawa. Well, I think you could – first of all, he did say – specifically say lack of motivation in regard to some of those poor findings. You're talking about the middle of ER 143? Yes. The claimant's inability to perform various cognitive tests appears to be a reflection of limited education as well as cultural issues? Right. And he says that in a couple of areas in his narrative findings. And what the ALJ has done here is taken Dr. Harakawa's acceptance of claimant's subjective account of her limitations as being based on subjective factors rather than a lack of credibility – subjective factors – cultural factors and a lack of motivation. The ALJ was – reasonably looked at that same evidence, that same report, and found it was more consistent with the fact that this claimant's not fully credible than with the fact that her culture prevented her from knowing where she was, what day it was, how many children she had, how old she was, what her birth date was, how to use a calendar, how to use a clock, things like that. The ALJ found that was credibility. Now, that sounded kind of iffy – iffy to me. I thought it read like the ALJ was calling her a liar and – or an exaggerator. And some of the stuff – it really didn't sound like support. Like, he says, well, she was a farmer in Thailand, but she says she's never worked. Well, farming is work. But what she said – what she was asked was, I haven't – I've never had a job. And a lot of people think of a job as where you work for somebody else and he pays you, as opposed to, say, if your family has a farm and you work like everybody else in the family. Well, you could certainly take it that way, but you can also take it as the ALJ did, that she won – depending on who she was talking to. I didn't have a job for 15 years. I was in the private practice of law and I kind of delighted in not having a job where I had to report to somebody else and he paid me. Well, you were lucky. But the ALJ also – And clients. I'm sorry. But no boss. And that's the way it is if your family has a farm and you work on the farm. Well, it's still work. I mean, this is – But it's not a job. Oh, that's not the only thing. Okay, but that's not the only thing the ALJ said. When she – she's alleged she doesn't know how a calendar works. I think it's very clear in this record that every time she was seen at King's Winery, she knew what date her menstrual period starts. Right there. She always shows up on time. And that's not – I'm sorry. I said you're right. She always shows up on time, which is kind of tricky if you don't know how to read the time or calendar. There's that, but she also was able to tell when her menstrual period started. That requires some basic knowledge of a calendar. She was always also fully oriented when she showed up at King's Winery, but didn't know where she – what city she was in or what day it was allegedly when she saw Dr. Hirakawa. The ALJ weighed this report in the context of this record as a whole, and I would love to point out that two psychiatrists, state agency psychiatrists, reviewed this record after psychologist Dr. Hirakawa examined her and both concluded she was capable of the same kind of work the ALJ found she was capable of. We also have Dr. Kasner who believed this person could work, and we also have a report from King's Winery, the only treatment she had there, in March of 2005 saying she can work with glasses. So there are six doctors, notwithstanding Dr. Hirakawa in this record, who found this claim it could work. The ALJ looked at that entire record, assessed functional limitations that he found to be consistent with it as a whole, and he was perfectly allowed to reject Dr. Hirakawa. Let me get you to something. I don't know quite how it's going to fit in to the five steps and all that. Frankly, unless she was a field hand on a farm, which is a big unless, it's sort of hard to imagine how a woman like this gets a job. She seems to have such low intelligence that no matter what you ask her, she says, I don't know, and no matter what you tell her, she doesn't absorb it, and she doesn't speak English, and she doesn't have any great physical vigor. What can a woman like that do to earn a living? Well, first of all, whether or not she worked as a farmer in the past is not at issue here. This is a step five case. The statute, the regulations, the case history, legislative history all says it doesn't matter whether or not a claimant can actually get a job. It's whether or not she's medically proven she's incapable of doing that. It's not a case here. And the issues about language and so on are just not pertinent? Well, the grid sections for light work and medium work both explicitly contemplate someone who's illiterate or unable to communicate in English, can still perform all of the jobs under those two grids. The non-English speaking is taken account of then? Yes. I don't have the rules with me, the specific numbers, but it's the grid table for light work and the grid table for medium work both say illiterate, unable to communicate in English, no relevant past work, not disabled. And that's what we have here. So unless you have any further questions, I would say please affirm the ALJ. Okay. Thank you very much. Thank you both for your argument. If you want one minute, we will give you one minute. You seem anxious. Counsel talks about Mrs. Chang doesn't know how to use a calendar. She wasn't raised in Western culture. Of course she doesn't know how to use a Gregorian calendar. I don't know. I'm not hearing you. Of course she was what? Of course she wasn't raised in Western culture. And therefore? She doesn't know how to use a Gregorian calendar. That doesn't mean that she doesn't know how to use a calendar that is familiar to her and her culture. The only reason I know that I was born in the year of the rat is because my son is born 36 years later and he looked it up and he says, Hey, Dad, we're both rats. But other than that, I don't know. I don't know how to tell what year I was born in the Chinese calendar or the Hebrew calendar because they're outside my cultural paradigm. But that doesn't make me a malingerer and it doesn't make Mrs. Chang a malingerer that she doesn't know that she was born on July 16th. Thank you. Okay. Thank you very much. Thank both of you for your argument. As I say, we will have a third judge and we will make a decision. Thank you very much. The case of Chang v. Astro is submitted and we are in recess until tomorrow morning. Thank you very much. Thank you very much. Thank you very much.
judges: Kleinfeld, Berzon